## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

IN RE:

CARIBBEAN PETROLEUM, LP.,                **CIVIL NO.** 04-1964 (FAB)

**Debtors.**

### OPINION AND ORDER FOLLOWING BENCH TRIAL

BESOSA, District Judge.

## I.   INTRODUCTION

Plaintiffs are 263 residents of Cabrera Development in Utuado; the development borders the Rio Grande de Arecibo.  On July 11, 1994, they filed suit for damages under Article 1802 of the P.R. Civil Code, P.R. Laws Ann. tit. 31 § 5141, against Caribbean Petroleum Corporation ("Caribbean Petroleum" or "Gulf") in the Superior Court of Utuado, alleging that they had been harmed by the fumes from a gasoline spill that occurred at a Gulf gasoline station in their vicinity.  They alleged that the fumes came from gasoline that seeped from the gasoline station through the ground near their homes, eventually reaching and contaminating the Rio Grande de Arecibo.  On March 7, 1994, Caribbean Petroleum accepted responsibility for the spill.  (Joint Exh. I, pp. 9 and 11.)  The Utuado Court then bifurcated the case and held a trial on the issue of negligence and liability.

On April 5, 2005, the Utuado Court issued an Amended Partial Judgment holding that a causal relationship existed between the

gasoline spill and the following damages claimed by plaintiffs: eye, throat and nose irritation; headaches; an increase in the number and severity of allergies in those plaintiffs with preexisting allergy conditions; and mental and emotional anguish stemming from the disturbance and interruption of plaintiffs' individual and family lives.[1]   The Amended Partial Judgment is final and was not appealed by the defendants.  (Joint Exh. I)

A subsequent trial intended to determine damages was never held by the Utuado Court because Caribbean Petroleum filed a bankruptcy petition before the United States Bankruptcy Court for the District of Delaware.   The Delaware Bankruptcy Court transferred plaintiffs' claims to the United States Bankruptcy Court for the District of Puerto Rico, which in turn referred the claims to this Court for the final liquidation of damages.

The parties then agreed to classify the plaintiffs into three basic categories, according to the severity of their damages.  On July 6, 2006, this Court scheduled the trial for the first 82 plaintiffs referred to as "Group 3" (asthmatic patients and other illnesses relating to respiratory tract health).   During the Pretrial Conference held on February 12, 2007, this Court ordered the parties to choose a representative sample of plaintiffs from

---

[1] The Judgment was issued after a trial held during March 2-27 and August 10-18, 1998.  During the trial, the Utuado Court heard extensive expert testimony on medical and technical issues, as well the testimonies of several plaintiffs.  (Exhibits I-III)

Group 3 for trial purposes.  (See Docket Nos. 62 and 72.)  Once the
judgment for damages as to the representative plaintiffs were
entered, the Court expressed, the parties will "have a better sense
of what will happen with the others" and "may be able to settle
out" the case as to the remaining plaintiffs.  (Docket No. 72,
Transcript of the Pretrial Conference held on February 22, 2007,
p. 10, lines 19-24.)

A bench trial was held on July 2, 3, 5, 6, and 16-20, 2007, on
the issue of damages as to the first group of 17 representatives
from Group 3 (Docket Nos. 87-90, 101-104.)  The parties then filed
their proposed findings of facts and conclusions of law (Docket
Nos. 111 and 112.)  Upon due consideration of the testimonial and
documentary evidence presented at trial, and pursuant to Rule 52(a)
of the Federal Rules of Civil Procedure, the Court now issues its
findings of fact and conclusions of law.

## II.  DAMAGES IN PUERTO RICO

Article 1802 of the Civil Code provides, in its pertinent
part, that "[a] person who by an act or omission causes damage to
another through fault or negligence shall be obliged to repair the
damage so done."  P.R. Laws Ann. tit. 31 § 5141.  To prevail in a
cause of action for fault or negligence, a plaintiff must prove, by
a preponderance of the evidence, the following elements:  (1) an
act or omission constituting fault or negligence; (2) injuries; and
(3) a causal connection between the act or omission and the

Civil No. 04-1964 (FAB)                                           4

injuries. <u>Admor, F.S.E. v. Almacen Ramon Rosa</u>, 151 D.P.R. 711, 725
(2000)

Preponderance of the evidence means nothing more than to prove
that the defendant's negligent conduct or omission was the factor
that **most probably** caused the plaintiff's damages. <u>Perez-Cruz v.
Hosp. la Concepcion</u>, 115 D.P.R. 721, 732 (1984) (emphasis added);
<u>Rivera v. Turabo Med. Ctr. P'ship</u>, 415 F.3d 162, 168 (1st Cir.
2005)

The principle underlying the calculation of damages is clear:
damages in Puerto Rico are compensatory. <u>Torres v. Castillo-
Alicea</u>, 111 D.P.R. 792, 804 & n. 7 (1981); <u>Perez v. Sampedro</u>, 86
D.P.R. 526, 530 (1962); <u>see also</u> <u>Marina Industrial v. Brown Boveri</u>,
114 D.P.R. 64 (1983) (punitive damages do not exist in Puerto
Rico); and <u>Noble v. Corporacion Insular de Seguros</u>, 738 F.2d 51, 54
(1st Cir. 1984).  When determining the amount of damages that a
party is entitled to recover, however, the courts "must not lose
sight of the fact that section 1802, being a remedial statute,
should be liberally construed to accomplish its purpose." <u>Rivera
Colon v. Diaz Arocho</u>, 2005 T.S.P.R. 116 at p. 17; <u>Dorante v.
Wrangler</u>, 145 D.P.R. 408 (1998); and <u>Muñoz Hernandez v. Policia de
P.R.</u>, 134 D.P.R. 486 (1993).  Therefore, the purpose of
adjudication of damages pursuant to article 1802 is to put the
injured party, as **nearly as possible**, where he would have been had
the breach not occurred. Cappalli, <u>Tort Damages in Puerto Rico</u>, 46

Rev.Jur.U.P.R. 241, 242 (1977); J. Puig Brutau, <u>Fundamentos de Derecho Civil</u>, 512 (1976).

Under Puerto Rico law, there are two types of recoverable damages: pecuniary or economic damages, and moral damages. The Puerto Rico Supreme Court has defined moral damages as "the damage inflicted on the beliefs, feeling, dignity, social esteem, or physical or mental health of the injured party." <u>Rivera Colon</u>, 2005 T.S.P.R. at 18. Because it is "symbolic in nature," the courts are called to quantify the moral damages suffered by a plaintiff in monetary terms. In doing so, however, ". . . the damages must be totally redressed." <u>Rivera Colón</u>, 2005 T.S.P.R. at 18.

The Puerto Rico Supreme Court has acknowledged the courts' "delicate challenge" in assessing and valuing damages. <u>Rivera Colon</u>, 2005 T.S.P.R. at 23. <u>See, e.g.</u> <u>Rivera Colon</u>, 2005 T.S.P.R. at 21; <u>Rodriguez Cancel v. A.E.E.</u>, 116 D.P.R. 443 (1985). "Awarding an insufficient sum in damages has the effect of diminishing the civil liability to which the tortfeasor must be subject; on the other hand, awarding an exaggerated sum entails a punitive element not recognized in [Puerto Rico's] legal system." <u>Rivera Colon</u>, 2005 T.S.P.R. at 22. Thus, when awarding damages, courts must reasonably balance the damages caused and the compensation awarded. <u>Id.</u><i>;</i> <u>see also</u>, <u>Nieves Cruz v. U.P.R.</u> 151 D.P.R. 150 (2000).

That does not mean, however, that a determination of moral damages depends solely on material facts and purely objective evidence.  Instead, "it is an undertaking that tolerates a certain degree of speculation, inasmuch as it relies, to a greater extent than special damages, on subjective factors such as the discretion, the sense of justice and the humane conscience of the trier of facts."  Rivera-Colon, 2005 T.S.P.R. at 23 (official translation); S.L.G. Rodriquez v. Nationwide, 156 D.P.R. 614, 622 (2002); Urrutia v. A.A.A., 103 D.P.R. 643, 647 (1975)

Finally, it is important to mention that some of the plaintiffs that testified before this Court did not provide a copy of their medical records.  As the Court will later explain, however, that does not limit this Court's discretion to determine the amount of damages to which each plaintiff is entitled.  In fact, in determining the amount of damages suffered by each plaintiff, this Court does not need to rely **exclusively** on the existence of medical records.  Rather, it is called on to weigh and consider **all** the evidence presented by the parties.[2]  Thus, defendant's bald assertion that "the damages claimed must be

_____

[2] This includes plaintiffs' testimony and the expert opinion of the plaintiffs' and defendants' expert witnesses (who may base their opinions or inferences upon facts or data perceived by or made known to them at or before the hearing.  See, Fed.R.Evid. 703; see also, Torres-Lazarini v. United States, 523 F.3d 69, 74 (1st Cir. 2008)(quoting United States v. Shelton, 490 F.3d 74, 79 (1st Cir. 2007)("[i]t is well within the fact-finder's province to determine the weight accorded to expert witnesses."))

reflected on the medical records and that the expert medical opinion must rely on the documentation found in the medical records" is misguided.  (Docket No. 112, p. 75)

## II.  FINDINGS OF FACT[3]

### A.  The Utuado Judgment

The exact date when the gasoline spill occurred is unknown.  (Joint Exhibit I, p. 5)

After accepting responsibility for the spill, Caribbean Petroleum took care of the clean-up during February, 1994.  The amount of gasoline spilled was between 5,000 and 20,000 gallons. (Id. p. 23, ¶ 86)

Gasoline is a respiratory irritant.  The degree of irritation, however, depends on its concentration and the duration of exposure to it.  (Id. p. 45)

During January, 1994, a product recovery trench was excavated behind the Rotary Club, to gather the gasoline before it reached the river.  (Id. p. 12.)  The trench was closed in December, 1995, after the Environmental Quality Board gave its authorization.  (Id. p. 19.)

The plaintiffs were exposed to gasoline fumes of varying intensity for a period of 48 months (1994-1997).  The plaintiffs

---

[3] The court incorporates the pertinent facts as originally found in the **final** Partial Judgment entered by the Utuado Court, for a complete adjudication of the damages suffered by the plaintiffs in this case.

were exposed to gasoline odors that exceeded the limits of exposure desirable for any community. (Id. p. 42.)

Plaintiffs began to feel strong gasoline odors by late 1993. During the months of January, February and March, 1994, the odors were felt with greater intensity. (Id. pp. 6 and 41.) During that time, the odors were felt from two to five minutes. Id. p. 41.

The period with the greatest intensity of odors and symptoms was during 1994 and 1995. During 1995, gasoline odors decreased and plaintiffs' health conditions generally stabilized. (Id. pp. 41-42.) From 1996 through December 1997, plaintiffs felt sporadic and fewer gasoline odors. The odors, though sporadic and fewer, continued to last from two to five minutes. (Id. p. 41.)

The Utuado Court received evidence of the human exposure levels to gasoline components, the nature of these components, and the effects of those components on the plaintiffs. (Id.)

Several of the plaintiffs testified before the Utuado Court, to wit, Aristides Rodriguez, Alicia Villafañe, Eneris Gutierrez, Shara Lee Vera, William Acevedo Labrador, Amilcar Lafontaine, and Ana Veronica Maldonado.

During the Utuado Trial, both parties presented expert testimony (pneumologists) who examined medical records. Plaintiffs' expert witness, Dr. Yohanna de Jesus, interviewed the plaintiffs and examined 70 claimants' medical records. (Id. pp. 45

and 47.)  Defendant's expert witness, Dr. Amill, did not interview any of the plaintiffs and limited his expert opinion to the examination of the plaintiffs' medical records.  (Id. p. 48.)

Dr. de Jesus and Dr. Amill agreed that the symptoms and the degree of irritation that a person exposed to gasoline fumes may suffer depend upon the magnitude and duration of such exposure. (Id. p. 45.)  Both expert witnesses also agreed that "asthmatic patients are more susceptible towards irritating substances than other patients are."  (Id. p. 48.)

The Utuado Court also found that "[plaintiffs'] medical records corroborate an increase in respiratory symptoms for the spill period.  Worsening of temporary or permanent asthma, development of broncho-spasms, or worsening of Chronic Bronchitis." (Id. p. 45.)

The Court held that a causal relationship existed between the gasoline spill and the following damages:

a.   irritation to eyes, nose and throat;

b.   headaches;

c.   increase and severity of pre-existing asthmatic seizures;

d.   increase and severity of pre-existing allergies; and

e.   mental and emotional anguish as a result of disruption of plaintiffs' personal and family lives.  (Id. p. 42.)

The Utuado Judgment is final and unappealable.

Having considered the findings made by the Utuado Court and after due consideration of the testimonial and documentary evidence presented at trial, this Court now issues its findings of fact.

During the bench trial held before the undersigned, a first group of 16 representatives from Group 3 testified.  Their names are:

1.   Aristides Rodriguez-Rivera,

2.   Eneris Gutierrez-Torres,

3.   Alicia Villafañe-Orgay,

4.   Jose O. Ralat-Aviles,

5.   Shara Lee Vera-Negron (as to her own damages and as to the damages claimed by her minor son Agustin Ruiz-Vera),

6.   Elsie C. Alvarez-Serrano,

7.   Carlos J. Rodriguez-Rodriguez,

8.   Jose Guzman-Matias,

9.   William Acevedo-Labrador,

10.  Rebeca Rodriguez-Ariño,

11.  Edgard Reyes-Perez,

12.  Delia I. Reyes-Jimenez,

13.  Ana Veronica Maldonado-Rivera,

14.  Miriam Maldonado,

15.  Lillian Montalvo,

16.  Mirta E. Jordan.

Both parties also presented expert witnesses. Plaintiffs presented the expert testimony of Dr. Yohanna de Jesus who testified on July 5, 6, 19 and 20, 2007.  Defendant's expert witness, Dr. Arturo Cedeño, testified on July 16 and 20, 2007.

**B.   Testimony**

**1.   Aristides Rodriguez**

Plaintiff Aristides Rodriguez has been living at B-20 Cabrera Development since 1970.  He holds a bachelors degree in history and sociology.   He was employed by the Puerto Rico Department of Education from 1964 until 1996, when he retired after working for 32 years as a high school history teacher.  After his retirement, he taught at a private school from 1996 to 2006. (Docket No. 87, Transcript of the proceedings of Bench Trial held on July 2, 2007, pp. 11-12.)   (<u>See also</u>, Cabrera Plot Plan, Plaintiffs' Exh. 6.)  He is the father of three children, Carlos Javier Rodriguez, Ada Elba Rodriguez and Jose Luis Rodriguez. (Plaintiffs' Exh. 3A.)

Mr. Rodriguez first noticed that a strong gasoline odor in December 1993.  Together with some neighbors, Mr. Rodriguez began to look for the source of those odors.  He first visited the site where the police station was being constructed at the time, but was unable to detect the source of the odors.  After a few days of rain during the second and third weeks of that December, Mr. Rodriguez observed that the odors intensified to such a level

that he described he felt as if he had put his head in a gasoline can.  (Tr. p. 19, lines 12-20, 24-25 and p. 20, lines 1-2.)

On December 29, 1993, Mr. Rodriguez took his daughter Ada to the emergency room, where she received respiratory therapy after complaining of respiratory problems, eye irritation, and dizziness.  Before that day, she had never needed respiratory therapy.  Seeing his child suffering like this was a hard blow to Mr. Rodriguez.  (Id. p. 21, lines 21-25.)

During that same day, significant for him because of his daughter's illness, Mr. Rodriguez observed traces of gasoline seeping into the Rio Grande de Arecibo.  He made these observations from 1:00 p.m. to 2:00 p.m.  Mr. Rodriguez observed that water was seeping together with the gasoline from the western part of an area known as the rotary group and from a location in a dried-up stream. The following day, Mr. Rodriguez visited the Environmental Quality Board in Arecibo to inform them about what he had observed.  (Tr. p. 20, lines 12-22.)

During the night of December 29, 1993, Mr. Rodriguez, his wife, and two of their three children abandoned their house because of the intense gasoline odor and went to the "local plaza."  He felt like "having a gasoline container in front of him."  Mr. Rodriguez saw other families at the local plaza that had left Cabrera Development also because the intense gasoline stench that they felt.  (Tr. p. 21, lines 11-19.)

Mr. Rodriguez suffered from eye irritation and severe headaches which to him felt like having thousands of pins going through his brain.  Under the stress of the situation, he forgot about or ignored his condition, however, but remained concerned about his family (his wife, daughter and son) (Tr. p. 22, lines 12-14.)

On December 31, 1993 it rained in Cabrera.  That day, Mr. Rodriguez noticed that the intensity of the stench of gasoline odors had increased, and the effects upon his family and him were aggravated.  In addition to headaches, he suffered from eye irritation (including constant crying and sticky kind of tearing.)  In the morning, his eyelids would be stuck together with what he called serum and waxing.  Mr. Rodriguez also suffered from a stronger irritation to his throat, which he described as having sort of a "grater" inside his throat, which would irritate his throat whenever he ate or swallowed something.  He was also affected by a dry but not phlegmatic-type of cough.  (Tr. p. 24, lines 3-24.)

His customary practices of reading between one and a half and two hours every night was limited by his eye irritation. (Tr. p. 24, lines 1-9.)

Mr. Rodriguez did not always experience these symptoms simultaneously.  The most common of his symptoms were eye irritation and respiratory difficulties, which he generally

experienced together.  The respiratory symptoms he experienced where pressure, stuffy nose, and on occasion, mucous and water discharge from his nose.  He also experienced increased tiredness and as a result, during the duration of the spill, he was unable to walk or jog as he used to do before the spill.  (Tr. p. 28, lines 2-4 and 12-16.)

In January 1994, he suffered from these conditions at least three or four times a week, primarily at nighttime and during the early morning hours.  (Tr. p. 28, line 8.)

Mr. Rodriguez observed that whenever the temperature dropped and/or when it rained the stench from the fumes was stronger.  The entire situation made him feel anxious because of the numerous trips his family had to take to the physicians and the emergency room, and because they did not have the means to move from Cabrera Development.  Having to take his family outside of Cabrera when the gasoline stench was stronger and to observe his wife and his children in this situation would generate an anxiety that at times would become a shared annoyance.  (Tr. p. 28, lines 20-25 and p. 29, line 1.)

In February, 1994, the situation was identical to the situation in January.  The effects of the fumes were felt two or three times a week, with similar symptoms.  Mr. Rodriguez identified these effects both on himself and his family.  (Tr. p. 29, lines 8-11.)

In comparison to January and February, however, the odors became more intense during March, 1994.  The odors increased, and the effects on Mr. Rodriguez intensified.  (Tr. 82, p. 31, lines 12-13.)  He felt the fumes and its consequences two to three times per week.  (Tr. pp. 31-32.)  His family's situation worsened and became an "[i]nferno because I had my family at that location which should be the most secure, safest area, and which we had acquired on a huge sacrifices [sic], and I became aware that it was not a safe location either for my family or for my neighbors, but most of all, knew it wasn't for my family.  And it was an inferno because there was no place — have an idea when this odors would come, rather that they would all happen at any given point."  (Tr. p. 32, lines 15-25.)

April was a "very bad" month for Mr. Rodriguez.  It rained during the month, which caused more gasoline to seep into the river.  This in turn intensified the stench of the gasoline.  Mr. Rodriguez was exposed to this odor two to three times a week during April, and every morning he woke up with the "sticky" secretions in his eyes.  (Tr. 82, p. 33.)

In May, Mr. Rodriguez was exposed to the gasoline fumes as frequently as he had been during the preceding months, but the symptoms he suffered somewhat changed during this month.  He experienced less headaches but had more issues with his respiratory

tract in the form of a stuffy nose and mucous secretions.  (Tr. 82, p. 34, lines 14-17.)

He also experienced problems sleeping from January to May, 1994.  He could not sleep because of the odors at night as well as the growing concern for his children's health; he already had to take one of them to the emergency room.  In addition to the stress caused by his family's health, Mr. Rodriguez was also concerned about the situation created by the gasoline spill in his community.  (Tr. p. 35, lines 13-19.)

Mr. Rodriguez's symptoms continued during June, 1994, but to a lesser extent.  He indicated that he experienced the same symptoms he had felt previously, but not as often, perhaps twice every 15 days.  Mr. Rodriguez had to take his son to the emergency room, however, to obtain respiratory therapy.  In addition, he hosted a teacher's activity at his home which was suspended because of the strong gasoline odors.  Some of Mr. Rodriguez's colleagues at the activity asked him how he could stand the strong odors.  (Tr. p. 36, lines 18-21.)

July, 1994, was a repetition of the previous month. (Tr. p. 37, lines 9-10.)

In August the situation changed and Mr. Rodriguez suffered stronger effects because of the intensification of the odors.  August was a very rainy month.  During the night of August 17, 1994, Mr. Rodriguez had to take his daughter Ada to the

emergency room once more.  He experienced reddened eyes, headaches, cough, and itchy skin.  In August, however, he felt the effects once a week.  (Tr. pp. 39 and 40.)

In September 1994 the odors were "terrible" for Mr. Rodriguez, but he felt the effects just once a week.  (Tr. p. 40, line 24-25 and p. 41, lines 16-17.)

October 1994 was a very cold and rainy month in Utuado.  During that month, Mr. Rodriguez's symptoms exacerbated and the number of days when the effects were felt increased.  The rain caused the gasoline odors to be stronger and more severe and Mr. Rodriguez felt intense headaches, eye and air tract irritation more than three times a week.  (Tr. p. 48, lines 9-22.)

November 1994 was similar to October 1994 in terms of the exposure to strong and severe gasoline odors and its effects on Mr. Rodriguez and his family.  During that month, Mr. Rodriguez took his mother to the emergency room in Utuado because she was having great difficulty breathing, experienced eye irritation and felt kind of dazed.  During this month, he felt the effects previously described two to three days a week, on average.  (Tr. pp. 49 and 50.)

Mr. Rodriguez described how he felt the odors during December to be as "terrible and intense."  He suffered the effects every day, although not with the same intensity as previously. (Tr. p. 51, lines 24-25 and p. 52, lines 1-2.)

1994 was a "very difficult year" for the Rodriguez family.  Prior to 1994 the family seldom went to the doctor.  After 1994, however, doctor's visits were much more common and, for the first time ever, Mr. Rodriguez took two of his children to the emergency room.  Mr. Rodriguez's social life was also affected because his friends stopped visiting him at his house because of the strong odors.  The family structure was also affected.  For example, he told two of his children, who were away at college, not to come home during the weekends because he feared that upon coming to their home on the weekends "they would be exposed to a negative condition in terms of their health."  (Tr. p. 53, lines 3-5.)

Mr. Rodriguez prepared a chart of his daily perceptions of the fumes.  The chart covers from January 1995 to March 1997.  He classified the odors as "strong" or "moderate or slight."  According to his perception, when the odors were "strong" at least one of the following occurred:  eye and respiratory tract irritation, skin rash, headaches and dry cough.  On the other hand, when Mr. Rodriguez classified the odors as "moderate or slight," the symptoms were felt with less intensity or he felt no odors at all.  (Tr. p. 45, lines 22-23 and Plaintiff's Exh. 5.)[4]

He further testified that during January 1995, he felt "strong" odors for 22 days, "moderate" odors for 6 days, and

---

[4]    The chart was admitted as an exhibit **only** as to Mr. Rodriguez.  (Tr. p. 58, lines 22-23 and Docket No. 114, p. 3.)

recorded 3 days with no data.  During February 1995, Mr. Rodriguez
felt "strong" odors for 17 days, "moderate" odors for 2 days, and
9 days with no data.  During March 1995, he felt "strong" odors for
7 days, "moderate" odors for 12 days, and 12 days with no data.
During April 1995, he felt "strong" odors for 2 days, "moderate"
odors for 19 days, and 9 days with no data.  During May 1995, he
felt "strong" odors for 2 days, "moderate" odors for 13 days, and
16 days with no data.  During June 1995, he felt "strong" odors for
2 days, "moderate" odors for 7 days, 1 day with no odors, and 20
days with no data.  During July 1995, he did not feel any strong
odor, but felt "moderate" odors for 19 days, 3 days with no odors,
and 8 days with no data.  During August 1995, he felt "strong"
odors for 8 days, "moderate" odors for 20 days, and 3 days with no
data.  During September 1995, he felt "strong" odors for 14 days,
"moderate" odors for 12 days, and 4 days with no data.  During
October 1995, he felt "strong" odors for 27 days, "moderate" odors
for 3 days, and 1 day with no data.  During November 1995, he felt
"strong" odors for 24 days, "moderate" odors for 5 days, and 1 day
with no data.  During December 1995, he did not feel any "strong"
odor, but felt "moderate" odors for 29 days, 1 day with no odors,
and 1 day with no data.  During January 1996, he felt "strong"
odors for 13 days, "moderate" odors for 18 days.  During February
1996, he felt "strong" odors for 2 days, "moderate" odors for 20
days, 5 days with no odors, and 2 days with no data.  During March

1996, he felt "strong" odors for 1 day, "moderate" odors for 15 days, and 15 days with no odors.  During April 1996, he felt "strong" odors for 5 days, "moderate" odors for 14 days, 7 days with no odors, and 4 days with no data.  During May 1996, he felt "strong" odors during 1 day, "moderate" odors for 12 days, and 18 days with no data.  During June 1996, he felt "strong" odors during 2 days, moderate odors for 24 days, and 4 days with no data. During July 1996, he did not feel any strong odors, "moderate" odors for 24 days, and 7 days with no data.  During the month of August 1996, he felt "strong" odors during 5 days, "moderate" odors for 20 days, and 6 days with no data.  During September 1996, no "strong" odors were felt, "moderate" odors were felt for 18 days, and 12 days with no data.  During October 1996, he did not feel any "strong" odors, "moderate" odors were felt for 18 days, and 13 days with no data.  During November 1996, he did not feel any "strong" odors, "moderate" odors were felt for 22 days, and 8 days with no data.  During December 1996, he felt "strong" odors during 6 days, "moderate" odors for 19 days, and 6 days with no data.  During January 1997, he felt "strong" odors for 2 days, "moderate" odors for 17, and 12 days with no data.  During February 1997, no "strong" odors days were recorded, but "moderate" odors were felt for 4 days, and 24 days with no data.  Finally, in March 1996, he felt "strong" odors for 2 days, "moderate" odors for 3 days and 26 days with no data.

Mr. Rodriguez did not seek medical treatment for any of his symptoms. Instead, he testified that he ignored his own conditions because he was concerned about his family's conditions. (Tr. p. 22, lines 12-14 and p. 50, lines 14-18.) Sometimes he ended up using the medications prescribed for his family members and also some eye drops that were given to him by his "brother Victor Manuel [who] worked at the hospital in Utuado." (Tr. p. 26, lines 13-25 and p. 27.)

Neither he nor his family members had medical tests to determine the presence or absence of gasoline components in the body. (Tr. p. 74, lines 19-22.)

As acknowledged by Dr. Cedeño, defendant's expert witness, Mr. Rodriguez's symptoms can be attributed to his exposure to gasoline fumes. Specifically, Dr. Cedeño testified that there is a fifty-fifty chance that Mr. Rodriguez's symptoms were caused by the gasoline odors. (Docket No. 101, pp. 118-130.)

The Court finds that Mr. Rodriguez has proven by a preponderance of the evidence that the damages he suffered were caused by the gasoline fumes. Accordingly, he is entitled to damages in the amount of **$65,000.**

### 2. Eneris Gutierrez-Torres[5]

Plaintiff Eneris Gutierrez-Torres was born on May 7, 1968 and works as the Director of an elementary school in Utuado. (Tr. p. 83, lines 3-4.)  She began to feel strong gasoline odors in late November of 1993, in the vicinity of her home at D-40 Cabrera Development.  (Tr. 82, p. 84, lines 21-22.)  At that time she had two children, Christian and Christopher Soto Gutierrez (16 and 15 years old respectively).  (<u>See also</u>, Exh. 6.)

Ms. Gutierrez testified during the trial held before the Utuado Court.  As part of its findings, the Utuado Court determined that, although Ms. Gutierrez has suffered from asthma since 1990, "as a result of [the gasoline] odors, [it] turned into Chronic Asthma".  (Joint Exhibit I, page 39, ¶ 9)  Because the Utuado Court's judgment is final and unappealable, this Court must respect this finding.

When she noticed that the gasoline odors were continuous, Ms. Gutierrez talked with her neighbors about it.  They told her that they also felt the odors.  After speaking with her neighbors, they contacted the Environmental Quality Board ("EQB") to notify it about the odors.

---

[5] <u>See</u>, Docket No. 82, pp. 82-139; Joint Exh. I; Exhs. 3B and 4C.

Ms. Gutierrez's family members were also affected by the gasoline odors.[6]   For instance, both her husband and their children began coughing a lot, experienced throat aches and breathing difficulties, and were taken to doctors for treatment. (Tr. p. 87, lines 8-10.)

Ms. Gutierrez visited the emergency room because of an exacerbation of her asthma condition.  Her first visit took place on January 2, 1994.  (Tr. p. 87, lines 14-15.)

Prior to her exposure to the gasoline odors, her asthma episodes were more sporadic (only two visits to the emergency room in 1993) and of a less serious nature.  As a result of her exposure to the gasoline fumes, however, her visits to the emergency room and the time she spent receiving treatment increased.

Even after she received treatment in January 1994, her health condition began to get worse.  She then decided to visit a pneumologist, Dr. Llompart, to receive treatment for her asthmatic condition.  Specifically, she visited Dr. Llompart after several instances when she was unable to breathe or to walk long distances without feeling tired.  (Tr. p. 92.)

---

[6] As it clearly appears from the record, the Court will **only** consider Ms. Gutierrez's testimony regarding the symptoms she, her then husband, and children suffered for a determination of **her** damages.  (Tr. p. 90, lines 15-24.)

The exacerbation of her asthma as well as her visits to Dr. Llompart and other doctors (Dr. del Valle and Dr. Caparros in Utuado) are documented in Dr. de Jesus' summary. (Plaintiff's Exh. No. 4C)  She also visited various other physicians during 1995 and 1996 to treat her symptoms.  Id.

As previously stated, Ms. Gutierrez's was diagnosed with "severe asthma" after the gasoline spill.  She was also affected by her children's health.  She became anxious and desperate because of her family's situation and was forced to visit rural areas during the weekends to escape the intensity of the fumes.  Those weekends, she visited her mother who lives in the Sabana Grande Ward.  (Tr. p. 97, lines 13-25.)  In addition, Ms. Gutierrez testified that she was anxious because she was unable to enjoy or perform those tasks she used to do as mother and as a wife. (Tr. p. 97, lines 4-9; see also, p. 105, lines 20-24.)  In other words, Ms. Gutierrez was affected physically and emotionally by the gasoline odors.

The gasoline odors also affected Ms. Gutierrez's daily activities.  She felt desperate and anxious.  Furthermore, she was not able to attend a "professional advancement activity" in San Juan because of an asthma attack, brought about as a result of her exposure to the fumes, and had to visit the emergency room of Hospital Pavia of Santurce instead.  Once at Hospital Pavia,

Ms. Gutierrez received respiratory therapy and medications such as aminophylline and Sulocotef.

She felt desperate during her asthma episodes and was required to purchase a respiratory therapy machine, as prescribed by pneumologist Dr. Llompart.

During the early months of 1994 (January to April) she felt the gasoline odors almost daily.

On several occasions during 1994, and after an asthma attack, Ms. Gutierrez visited the emergency room in Utuado at dawn, alone, in order not to disturb her husband.  She often slept in the living room so that she would not wake up the rest of the family at night.  During one of those nights, she had to be taken to the emergency room with the assistance of the 9-1-1 service.  (Tr. p. 101, lines 1-14.)

Ms. Gutierrez felt the gasoline odors in the afternoons, during the night, the early morning hours and when it rained.  According to her perception, the odors were stronger in 1994 and they lasted until 1997.  Her testimony is consistent with the findings made by the Utuado Court.

Ms. Gutierrez undertook all precautions in her home, such as eliminating detergents, rugs, covered the pillows and mattresses, etc. in order to attempt to lessen her asthma symptoms.

During the months of January-April of 1994 she would suffer daily episodes of asthma because of the strong gasoline

odors.  According to her testimony, early in 1994, she felt the odors every day.

Dr. Cedeño, defendant's expert witness agreed that:

•   Ms. Gutierrez's asthma episodes were not as frequent prior to the exposure period, that her condition worsened after 1993 and that, after 1993, there were reports of an increase in her frequency of visits to doctors.  (Tr. p. 132, lines 17-23.)

•   Her medical records (specifically a progress note dated April 22, 1994) reflect Ms. Gutierrez's exposure to gasoline (Tr. pp. 53 and 133.)  Dr. Cedeño further explained that the medical history of a patient is a "very important" factor to include in a patient's medical record if a patient is exposed to gasoline fumes or odors.  (Tr. p. 18, lines 18-19.)

Her specialist, Dr. Llompart, noted in Ms. Gutierrez's medical record (dated April 2, 1994) that the exacerbation of her asthma was due to the "gasoline fumes." (Docket No. 90, pp. 39-41.)

Ms. Gutierrez's symptoms and medical condition, as documented in her medical records and as described by her, are consistent with chronic exposure to an irritant such as gasoline. In fact, defendant's expert witness, Dr. Cedeño, testified as follows:

> "Q:  But life being imperfect, would you or not agree that in all likelihood gasoline is the explanation for the symptoms and conditions reflected in those records?

A:   I would agree with -- with you that
     gasoline may by [sic] one of the agents
     responsible for those.

Q:   Okay.  Is the answer the same to the
     symptoms and conditions  expressed to the
     Court in testimony by the **plaintiffs**?

A:   Gasoline would be one of the conditions,
     yes.  That could explain the symptoms,[7]
     yes."

(Docket No. 101, pp. 129-130.)

He further testified that the exposure "may" have affected the plaintiffs and, **that it was more likely than not** that Ms. Gutierrez's conditions and symptoms, as claimed in her testimony and as indicated in her medical records, were caused by the gasoline fumes.  The same was true also as to the plaintiffs whose records he examined or heard in Court.  (Tr. pp. 118-130 and 152-162.)

Plaintiffs' expert witness, Dr. de Jesus described the aggravation of Ms. Gutierrez's asthma condition as "dramatic" because of the increase in visits to doctors related to asthma symptoms and medication to control these symptom after the spill.

Ms. Gutierrez never had medical tests performed to determine the presence or absence of gasoline components in the body.  (Tr. p. 119, line 4.)

---

[7] Among the symptoms that may be caused by exposure to an irritant like gasoline are:  eye irritation, irritation of the throat, larynx, lower tract of the respiratory system, and asthma. (Tr. p. 131.)

The Court finds that Ms. Gutierrez has proven by a preponderance of the evidence that the damages she suffered were caused by the gasoline fumes. Accordingly, she is entitled to damages in the amount of **$100,000.**

### 3.   **Alicia Villafañe**[8]

Alicia Villafañe-Ongay lived at B-21 Cabrera Development from 1983 to 1997. She is married to Jose Orlando Ralat with whom she has two children. Her husband, also a plaintiff in this case, testified before this Court. (Transcript of Bench Trial held on July 3, 2007, Docket No. 88, p. 6, lines 9-18.) (See also, Exh. 6.)

Ms. Villafañe testified before the Utuado Court.[9]

In 1984, Ms. Villafañe was found to be disabled by the Social Security Administration because of her bronchial asthma.

---

[8]  See, Docket No. 88, pp. 6-47 ; Joint Exh. I; Exh. Nos. 3C and 4D.

[9]  As part of its Judgment, the Utuado Court concluded that Ms. Villafañe was asthmatic and suffers from Lupus and hypoglycemia. In addition, she testified before the Utuado Court that she felt the gasoline odors quite severely during 1993 and 1994. By 1997, she further testified, the odors were "very minimal". The Utuado Court also made the following findings: that her asthma acted up during gasoline odor periods, receiving therapy four times a day; during daylight hours she would go to her father's house, also in Utuado, and her health would improve; she was given disability in 1984 because of bronchial asthma; and that she was hospitalized ten times in 1995 for asthma. Furthermore, it found that her asthma condition was stable in 1996-1997. The worse years of the symptoms were 1994 and 1995. (Joint Exh. I, pp. 40-41, ¶¶ 23-28.)

She also suffers from Systemic Lupus Erythematous and fibromyalgia. (Tr. p. 7, lines 12-23.)

She began to smell strong gasoline odors in late November 1993, whereupon she became nervous because she was not able to identify the source of the odors and was also becoming more asthmatic. (Tr. pp. 8 and 9.)

Before her exposure to the strong gasoline odors, her asthma had been under control. In 1994, after the gasoline odors began, however, the frequency of her asthma attacks increased. (Tr. p. 9, lines 13-17; see also, Plaintiffs' Exh. 4D, p. 1.) In other words, the gasoline fumes exacerbated (increased the attacks and their severity) Ms. Villafañe's asthma condition. She then visited doctors on frequent occasions: March 11, May 13, June 10, August 11, September 8 and October 28, as presented to this Court by Dr. de Jesus' expert testimony and by Ms. Villafañe. (Docket Nos. 88 and 90 and Exh. 4D.) Other visits are similarly documented for the years 1995, 1996 and 1997. Id.

Her medical records also include references to her exposure to gasoline odors.[10] Ms. Villafañe's medical record for September 29, 1995, indicates that she was having headaches and asthma episodes and that she continued living near a "gasoline

_____

[10] See, e.g., May 13, 1994; September 8, 1994; September 29, 1995; and October 24, 1997.

station."  Furthermore, on October 24, 1997, Dr. Rodriguez noted a persistent gasoline exposure.  (Exh. 4-D.)

The exacerbation of her asthma attacks required her to take additional medications and to use her asthma medication (Proventil), and respiratory therapies frequently.  (Exh. 4-D, see also, Docket No. 88.)

Among the symptoms Ms. Villafañe suffered because of her exposure to gasoline fumes were nervousness, nausea, panic, anxiety and fear of being left alone.  (Docket No. 88, pp. 8, 10, 14, 18-20, 29.)  As part of the medical records reviewed by Dr. de Jesus, however, there are no prescriptions for any anti-depressant by any physician.  (Plaintiffs' Exh. 4D.)

She visited the emergency room to receive treatment for her asthma condition in December 1993 and in 1994. (Plaintiff's Exh. 4D.) She testified both at the Utuado Court and in this Court that she felt the gasoline odors almost every day during 1994.  (Joint Exh. I, Tr. p. 19, line 25.)

Defendant's expert witness, Dr. Cedeño, testified -- and this Court so finds -- that Ms. Villafañe's asthma was stable prior to her exposure to the gasoline fumes and that her condition worsened in 1994.  In addition, as explained by both Dr. de Jesus and Dr. Cedeño, asthmatic patients can feel very anxious, stressed and panicky and have fears of death.  (Docket No. 101, pp. 145-147.)

Dr. Cedeño also testified that the panic and stress suffered by asthmatic plaintiffs who testified before this Court (Alicia Villafañe, Eneris Gutierrez[11] and Rebeca Rodriguez[12]), are appropriate descriptions of what asthmatic patients go through during asthmatic episodes.  (Docket No. 101, pages 148-149.)  He further testified that he did not have any reason or evidence to doubt the veracity of their claims, including Ms. Villafañe's claim.  (Id. 146-147.)

Dr. Cedeño further agreed that Ms. Villafañe's (as well as the other plaintiffs') symptoms and conditions were more likely caused by the exposure to gasoline fumes.

Ms. Villafañe needed to use a respiratory machine with more frequency because of the exposure to the gasoline fumes. She also had problems sleeping because of the odors and had to take sleeping pills to be able to sleep.  (Tr. p. 25, lines 7-12.)

Ms. Villafañe was more severely affected by the fumes during 1994 and 1995.  (Joint Exh. I.)

Ms. Villafañe was unable to escape from the fumes by moving out of the Development because she lacked the financial capacity to buy a new house.  (Tr. pp. 45 and 46.)

---

[11] See discussion, pp. 22-28.

[12] See discussion, pp. 48-50.

Ms. Villafañe was never ordered to provide any urine or blood samples for the purpose of determining the presence or absence of gasoline components in her body.[13]  (Tr. p. 37.)

The Court finds that Ms. Villafañe has proven by a preponderance of the evidence that the damages she suffered were caused by the gasoline fumes.  Accordingly, she is entitled to damages in the amount of **$85,000**.

### 4.    **Jose Orlando Ralat-Aviles**[14]

Mr. Jose Orlando Ralat-Aviles is married to Alicia Villafañe.  They lived at B-21 Cabrera Development, with their children in late 1993.  (<u>See</u>, Exh. 6.)  At that time he worked for the Puerto Rico Electric Power Authority ("PREPA") as a "customer services supervisor" in the Municipality of Arecibo.  He was also President of the Utuado Municipal Assembly for eight years.  (Tr. pp. 49-50.)

Mr. Ralat began to smell strong gasoline odors in the vicinity of his home in November and December 1993.  (Tr. p. 50, lines 2-4.)

He further testified that his family went through a very hard time because of the stress and constant concern over the frequency of Ms. Villafañe's asthma attacks.  (Tr. p. 52.)

_____

[13]   The Utuado Court found that "**[n]o physician with offices in Utuado [that] testified at trial, ordered this type of test.**"  <u>See</u>, Joint Exh. I, p. 42, ¶ 37.  (Emphasis in original)

[14]   See, Docket No. 88, pp. 48-69; Joint Exh. I and Exh. 3d.

Mr. Ralat took his wife to physicians, hospitals and to Dr. Caparros Diagnostic and Treatment Center in Utuado so that she could be treated for her asthma attacks. He also mentioned that Dr. Antonio Capella, a family friend, visited his house to evaluate his wife. (Id.) Mr. Ralat further testified that he experienced physical manifestations due to the stress that watching his family's situation caused him. For example, was affected "by seeing this crisis in my home because of my wife's nervousness."[15]

He also felt headaches, strong throat pain, throat infection, allergies, skin rash and watery eyes. (Tr. p. 54, lines 17-22.)

He also testified that leaving his house in the morning to go to work was disconcerting because it meant that he had to leave his wife by herself. Mr. Ralat was torn between his duties to his wife and his duties to his employer, PREPA. (Tr. pp. 59-60.)

Mr. Ralat also testified that the medical records for the visits to the Utuado Treatment and Diagnosis Center could not be obtained because the Center was later privatized and the records disappeared.

---

[15] As explained by the Court during trial, Mr. Ralat's testimony regarding his wife's health condition and his children's is being considered **only** to determine how Mr. Ralat was affected by their medical conditions. (Tr. 88, p. 58.)

Mr. Ralat also felt a duty to his neighbors as the President of the Utuado Municipal Assembly and took action to find a solution to the gasoline odor problem.  (Tr. pp. 60-61.)

Mr. Ralat felt the odors strongly during 1994 and 1995.  During 1996 and 1997, however, he felt the odors with less intensity.  (Tr. pp. 55-57.)

The Court finds that Mr. Ralat has proven by preponderance of the evidence that the damages he suffered were caused by the gasoline fumes.  Accordingly, he is entitled to damages in the amount of **$45,000.**

### 5.   **Shara Lee Vera-Negron and Agustin Ruiz-Vera**[16]

This court heard Ms. Vera's testimony on her own behalf and on behalf of her son Agustin Ruiz-Vera, who was three years old at the time of the exposure.  Ms. Vera also has a 15-year old son, Angel Ruiz-Vera, and is married to Agustin Ruiz-Cuevas. She lived at D-37 Cabrera Development throughout the exposure period.

Her family began to feel strong gasoline odors towards the end of 1993.  That caused her great concern because she occasionally suffered from allergic rhinitis and her son Agustin had asthma.

---

[16]   Plaintiffs' Exhs. 3E, 3F, 4B, 4E and 6.

Agustin had been diagnosed with asthma when he was 1 ½ years old by pneumologist Alejandro Mercado-Arroyo of San Pablo Hospital in Bayamon.

Based on Ms. Vera's testimony, Dr. de Jesus, Dr. Cedeño, as well as the testimony and summaries presented by Dr. de Jesus (Plaintiffs' Exhs. 4B and 4E), this Court makes the following findings as to the damages claimed by these two plaintiffs.

Ms. Vera suffered an inflamation of the upper respiratory mucous membranes and the larynx, and headaches due to the gasoline fumes. She described her pain as if someone had "scratched" her throat. Ms. Vera also experienced stuffy nose, nasal congestion, headaches, and general discomfort during the period of the gasoline spill. Prior to the spill she would sporadically take allergy medication but her allergies worsened because of the fumes.

She felt worse in 1994, but still had to make an effort to go to work because of her sense of responsibility. Nevertheless she had to miss work about 13 days between January and April 1994.

Ms. Vera was emotionally distressed because of the effect the fumes had on the health of her family as well as on her own health.

As to her child Agustin Ruiz, his asthmatic condition worsened due to the exposure to the gasoline fumes. Because of his asthma, he was more susceptible to the gasoline fumes.  During late 1993 and 1994 there was an increase in the utilization of bronchodilators and cortisone to control his asthma; and in 1995 he was referred again to a pneumologist and his respiratory therapies were increased to every four to six hours. A relation between his condition and the gasoline fumes was established by Dr. de Jesus.

While describing her son's condition and how the entire family was affected, Ms. Vera expressed that Agustin's asthma condition prevented him from sleeping and affected his breathing.  The medication he was taking to treat his condition made his heart beat faster.

1995 was a "time of crisis" for her family. Agustin did not want to sleep and Ms. Vera and her husband would spend all night with him on their shoulders, in a rocking chair.  That kept him upright and helped him to breathe better.  They both had to work every day and, when nighttime came, "it was a nightmare".  In Ms. Vera's own words:

> "We worked all day, we would take the child to the pediatrician in the afternoons, we would go [to] the drugstore, give him medication, and then we had a child who was tired, hyperactive, due to the medication which-which made him be that way.  He was congested.  And they started rocking him every night all night.  They would take turns rocking.  And the time came when we were so exhausted that the rest of the family noticed.  And my

dad would go to sleep early, and he would get home to my
house at 1:00 in the morning to provide a relief so that
we could rest.  And he remained all night until five
o'clock in the morning looking after the child's
breathing, rocking him, so that we could sleep for some
hours and be able to work the following day."

Tr. pp. 33-34.

She testified that she was concerned about the
future, about the medications Agustin was taking, about his health,
about her work, about everything: "I felt exhausted.  There's no
other word that can describe it.  Exhausted."  Her family didn't
have an option or the economic means to move from Cabrera.

This Court finds that but for the gasoline fumes,
Agustin's condition would not have been aggravated to the extent
that it was and he would have been able, though somewhat limited by
his asthma, to enjoy his childhood like any other child.

Accordingly, Ms. Vera is entitled to damages in the
amount of **$100,000** and Agustin Ruiz, her son, is entitled to
damages in the amount of **$50,000**.

## 6.   **Elsie C. Alvarez-Serrano**[17]

Ms. Elsie C. Alvarez-Serrano lives at E-6 Cabrera
Development; she is married to Amilcar Lafontaine (also a plaintiff
in this case).  She has a bachelors degree from the University of
Puerto Rico, and a masters degree in technology for educational

---

[17]  See, Docket No. 89, pp. 78-111; Exh. Nos. 3G, 4A and 6.

systems.  She has been living in Cabrera since February 11, 1993.
(Tr. pp. 78-79.)

Ms. Alvarez testified that towards the end of 1993 she began to smell strong and unbearable gasoline odors.  She then began to have strong headaches.  She felt a ". . . strong smell of gasoline that entered through my nose, and it seemed that it was burning my forehead and my whole face.  Sometimes I felt like there was drilling coming in one way and another way of my temples." (Tr. pp. 84 and 88.)

The odors also caused her to lose her sleep, because she could feel them at night and at dawn.  It was her testimony that the odors were "stronger during the afternoon, the evenings, and dawn".  (Tr. p. 85, lines 23-24.)  Her whole house would stink, with varied intensity depending on the time of the day.  (Id.)

In March of 1994, Dr. Rafael del Valle diagnosed her with migraines.  Once she got a headache due to the gasoline odors and she was not able to carry out her regular tasks at home because of the pain.  (Exhibit 4A and Tr. pp. 86 and 88-89.)

She was also concerned as a mother and wife about her family (children and husband), because they were also affected by the gasoline fumes.

Dr. de Jesus reviewed Ms. Alvarez's chart and prepared her summary based on the record's documentation from

October 1993 until the end of 1997.[18]  She found that Ms. Alvarez
suffered from eye irritation, sore throat, headaches and migraines.
Dr. Flores Ivan Caraballo, evaluated her for headaches and
diagnosed her with complicated migraine. (Plaintiffs' Exh. 4A, Tr.
pp. 89, 96 and 106-107.)

It is Dr. de Jesus' opinion that the effects
documented in Ms. Alvarez's chart are related to her chronic
exposure to the gasoline fumes in Cabrera from 1993 to 1997.
Specifically, Dr. de Jesus concluded that Ms. Alvarez's symptoms
(eye irritation, sore throat, headaches and migraines) were caused
by the chronic exposure to gasoline fumes.[19]  (Tr. pp. 24-27.)

Similarly, defendant's expert witness, Dr. Cedeño,
found that Ms. Alvarez's symptoms can be explained by her exposure
to gasoline fumes.[20]  (Docket No. 101, pp. 123, 130-131, 149-162.)

_____

[18]  As with all the other plaintiffs' summaries prepared by
Dr. de Jesus, the narrative part is a summary of what Ms. Alvarez's
record states.  The table is a list of medical appointments where
there is evidence of medical attention related to the effects that,
pursuant the Utuado Court's findings and her medical opinion, were
related to the gasoline fumes intoxication.  That is, it includes
the visits that resulted from the gasoline spill.

[19]  Defendant's expert witness, Dr. Cedeño, agreed that
plaintiffs were exposed "to a chronic [gasoline] exposure".
(Docket No. 101, page 129, lines 20.)

[20]  Dr. Cedeño's expert report was only based on the
plaintiffs' medical charts.  He did not have information about
Cabrera's atmosphere or of the Utuado Judgment at the time of the
report.  In addition, he did not consider several environmental,
geographic elements that explained the exposure. (Docket No. 101,
pp. 123-124)

Ms. Alvarez was never ordered to provide any urine or blood samples for the purpose of determining the presence or absence of gasoline components in her body.  (Tr. p. 109, lines 21-24.)

The Court finds that Ms. Alvarez has proven by a preponderance of the evidence that the damages she suffered were caused by the gasoline fumes.  Accordingly, she is entitled to damages in the amount of **$75,000.**

### 7.   **Carlos J. Rodriguez-Rodriguez**[21]

Carlos J. Rodriguez is a physical education teacher at the Felix Feijoo Elementary School in Utuado.  In 1993 he was a student at the University of Puerto Rico in Rio Piedras.  He described himself as a person in good health.  (Tr. p. 10.)

As a student, he lived in Hato Rey from Monday to Wednesday and traveled every week to his home in Cabrera to spend the weekends (usually from Thursday to Sunday).  (Id. pp. 10-11.)

While a student, he was part of the University's Olympic Weightlifting team, for which he received a scholarship. Since December of 1993, he began preparatory training sessions with a colleague.  From Mondays through Wednesdays or Thursdays, he trained at the University.  During the weekends, he trained in an "improvised gym" at Cabrera.  (Id. pp. 11-12.)

---

[21]   See, Docket No. 102, pp. 9-56; Exhs. 3H, 4A and 6.

Beginning in December of 1993, he began smelling gasoline odors when he practiced at the small gym in Cabrera.  The first odors were described by him "like if you would have a grass cutting machine or a tank of gasoline close to the area where [he] was practicing."  Id. p. 12.  He noticed that when he trained at the University of Puerto Rico he would not have headaches.  Id.

Carlos trained mostly in the afternoons because the climate was cooler and his trainer was available.  He testified that he smelled the gasoline odor more strongly in the mornings and in the afternoons.  (Tr. pp. 11, 14-18.)

In 1994 he experienced irritated eyes, dizziness and headaches.  Because weightlifting is an anaerobic sport, Carlos was required to catch his breath between repetitions.  As a result of the fumes he noticed that it took him longer to catch his breath to be able to go on to the next exercise.  Because of the discomforting odors, his training was affected.  He developed respiratory difficulties which he identified as "fatigue."  These effects were described as a whistling/hissing in his chest that prompted coughing.

He also required medical assistance.  While visiting in Utuado he suffered fatigue, dizzy spells, headaches, nasal dripping, and a burning sensation in his throat.  He would feel extremely strong odors early in the morning and late in the

Civil No. 04-1964 (FAB)                                                42

afternoon.  His symptoms persisted even while training at the UPR
Rio Piedras campus.  (Tr. pp. 12-15.)

        He completed his studies and returned to Utuado.  In
1995 he was hired as a teacher in a private school in Utuado.  (Tr.
p. 24.)

        During a weekend in May of 1995, he did not come
back to Rio Piedras on Sunday, as he usually did.  Instead, he left
Cabrera Monday morning not feeling well.  He felt like he lacked
air and fatigued, but not like the fatigue he "normally" felt.  His
fatigue symptoms felt more acute than before.  He was unable to
sleep and whenever he lay down, he felt like a person was sitting
on his chest.  The following morning, he went to the private school
where he worked.  At the school he began to suffer from symptoms
later identified as an asthma attack.  He was given Proventil, an
asthma medicine, and sent to the hospital.  He was admitted to the
emergency room of the Hato Rey Community Hospital, where he
remained for three days under continued medical supervision
receiving respiratory therapy and medication.  (Tr. pp. 18-25.)

        During 1995 and 1996 he continued to suffer the same
effects previously described due to the odors and fumes; at that
time he was living at Cabrera after having graduated from the UPR.
By December of 1996, however, he was able to get an apartment and
left Cabrera.  (Tr. p. 24.)

He did not have medical tests performed to determine the presence or absence of gasoline components in the body.  (Tr. p. 39.)

After she reviewed Mr. Rodriguez's chart and interviewed him, Dr. de Jesus testified that in her professional opinion the condition reflected by the symptoms, his hospitalization and treatment, was compatible with asthma caused by his exposure to the gasoline fumes in Cabrera.  Dr. de Jesus described the incident because of which Mr. Rodriguez was hospitalized in Hato Rey as a late stage reaction with bronchospams, which continued until his treatment at the hospital ended.  Asthmatic episodes, when associated with some sort of exposure, can have an immediate reaction.  Dr. de Jesus explained that Mr. Rodriguez felt ill in Utuado because of the neurogenic mechanism of gasoline and the allergic mechanism where irritation by gasoline facilitates the access of the allergen into the organism.  From Dr. de Jesus' medical standpoint, the effects documented in her chart are related to his exposure to the gasoline fumes in Cabrera, and so this court finds.

Defendant's expert witness, Dr. Cedeño, agreed that Mr. Rodriguez's claims and symptoms could likely have been caused by the gasoline fumes and that he had no grounds to support the contrary.  (Docket No. 104, pp. 139-140.)

We find that Mr. Rodriguez's physical and emotional symptoms were caused by exposure to the gasoline fumes. Accordingly, he is entitled to damages in the amount of **$45,000.**

8.   **Jose Guzman-Matias**[22]

Mr. Guzman-Matias has lived with his family at E-27 Cabrera Development since 1967.  His house is about 40 to 45 feet from the Rio Grande de Arecibo.  (Tr. p. 65.)

During 1993 and 1997 he lived at Cabrera with his wife and children.  He has a bachelors degree in education and worked for 34 years as a grammar and intermediate school teacher. (Tr. p. 57.)  He retired in August 1996.  (Tr. p. 58.)

He began to feel the fumes in November 1993 when he started feeling some itching in his body, watery eyes, throat irritation and headaches.  (Tr. p. 59.)  He felt a constant pain in his chest and throat, as well as certain discomfort while breathing.  He described his breathing discomfort as pressure in his chest that would not let the air come in or go out of his lungs.  He eventually requested medical assistance for these symptoms.  (Id. p. 60.)

During 1994 he felt headaches frequently.  He described his headache pain as if somebody was hitting him in the head with a sledgehammer.  (Tr. p. 62, lines 8-9.)  He also underwent respiratory therapy using his wife's respiratory

---

[22]  Docket No. 102, pp. 56-80; Plaintiffs' Exhs. 3I, 4F and 6.

treatment machine. Before 1994, he had never received such
therapy. For the years 1995, 1996 and 1997, he felt the same
effects, but they gradually subsided in 1996. He would experience
these symptoms approximately 3 or 4 days during a 7-day span. They
were particularly strong during early morning hours, the afternoon,
and whenever it rained. (Tr. pp. 63-64, 70.)

His privacy and family life was affected by the
spill. Id. pp. 65-66. He also suffered from the anxiety of
feeling unsafe in a house he acquired and paid for with sacrifice.
He had nowhere to go because he was unable to sell his residence at
Cabrera and could not afford to rent because he did not have enough
money. (Tr. pp. 66-67.)

He was also disturbed by the effects of the gasoline
fumes on his wife and by the "huge fear" developed by his son, who
screamed during the night and said that Cabrera might "blow up".
(Tr. p. 67, line 8.) He was unable to sleep because of all the
problems the family was undergoing. (Id. p. 69.)

After a review of all the documents related to
Mr. Guzman, Dr. de Jesus testified that during and after December
1993, Mr. Guzman's asthma condition was exacerbated. He also had
irritation of the eyes and pharynx, and headaches. It was Dr. de
Jesus' medical opinion that those symptoms were caused by the
inhalation of gasoline fumes, and this court so finds. The record
further supports her conclusion that Mr. Guzman received medical

treatment for these conditions.  He was medicated with eye drops to alleviate his eye irritation, anti-cough medication, bronchodilators, cortisone and antihistamines.  These medications are proper to treat the effects and conditions observed by the treating physicians in Mr. Guzman.

Similarly, Dr. Cedeño testified that the symptoms and conditions reflected in Mr. Guzman's records and described in his testimony (as well as those of the other plaintiffs) are consistent with the chronic exposure to an irritant such as gasoline.  (Docket No. 101, pp. 129-130.)  He further testified that the exposure "may" have affected Mr. Guzman and that it was more likely than not that his conditions and symptoms were caused by the gasoline fumes.  (Id. pp. 118-130, 152-162; see also, Docket No. 90, pp. 132-135, 138-140.)

Mr. Guzman was never ordered to provide any urine or blood samples for the purpose of determining the presence or absence of gasoline components in his body.  (Tr. p. 76.)

The Court finds that Mr. Guzman has proven by a preponderance of the evidence that the damages he suffered were caused by the gasoline fumes.  Accordingly, he is entitled to damages in the amount of **$40,000.**

### 9.   William Acevedo-Labrador[23]

Mr. William Acevedo-Labrador lived at E-3 Cabrera Development until October of 1999 with his wife (Evelyn Santiago) and two sons (William and Daniel Acevedo-Santiago.)  (Tr. pp. 81-82.)

Mr. Acevedo first felt the gasoline odors in November 1993.  (Tr. p. 82.)  He described the odor as "very strong, pure gasoline odors."  (Tr. p. 83.)  He felt the odor after coming home from work at the Puerto Rico Electric Power Authority (around 5:00 p.m.); and thereafter, at nightfall.

In 1994, he perceived gasoline odors daily, but their intensity varied every day.  In 1995 he felt the odors four or five days per week.  He had unbearable headaches, throat aches and felt like his eyes were burning.  He visited Dr. Jose Cortes of Utuado to treat his strong headaches; Dr. Cortes prescribed Migralan (a medication used to treat migraines.)  (Tr. pp. 83-85.)  His medical record, as summarized by Dr. de Jesus, also includes two visits because of eye and throat irritation, and headaches with specific reference to gasoline exposure on May 3, 1994.  (Exh. 4J.)

Dr. de Jesus testified that it is documented that the exposure to gasoline fumes produces headaches, in some literature called "chemical migraine."  She further testified that Mr. Acevedo's eye irritation and headaches were aggravated because

---

[23] Docket No. 102, pp. 81-100, Plaintiffs' Exhs. 3J, 4J and 6.

of his exposure to the fumes.  Dr. de Jesus' summary indicates that headaches were the cause of Acevedo's medical visits.  Thus, the court finds that the gasoline fumes caused the plaintiff's migraines during the exposure period.

Plaintiff was also emotionally affected by the gasoline effects on the health of his wife and children.  He felt helpless with the situation because his economic reality did not provide an alternative other than to remain in Cabrera Development.  (Tr. pp. 84-85.)

The Court finds that Mr. Acevedo has proven by a preponderance of the evidence that the damages he suffered were caused by the gasoline fumes.  Accordingly, he is entitled to damages in the amount of **$35,000.**

### 10.  **Rebeca Rodriguez-Aviño**[24]

Rebeca Rodriguez-Aviño was born in 1976 and lived with her parents at E-14 Cabrera Development at the time of the gasoline spill.  (Tr. p. 6.)

She had suffered from asthma and seasonal allergies since her childhood.  (Tr. p. 7.)  Because of this, she is more susceptible to the dangers caused by an irritant such as gasoline.

Before the gasoline spill, she had sporadic allergic reactions and she medicated herself with "over the counter" drugs.

---

[24] Transcript of proceedings on July 7, 2007, pp. 4-53; Plaintiffs' Exhs. 3K, 4G and 6.

In addition, before the gasoline spill, her asthma was under control.  (Tr. pp. 7-8.)

Ms. Rodriguez testified that in December of 1993, she felt the "strong gasoline odors" about 2-3 times a week.  (Tr. p. 9.)  The exposure to the fumes caused a burning and itching sensation in her nose and throat as well as a hissing in her chest. (Tr. p. 8.)

Her asthma attacks increased in 1994 when she felt the odors in the afternoons and evenings.  (Tr. p. 9.)  When exposed to the fumes, she felt discomfort in her nose and throat, difficulty breathing, nasal congestion, dry cough and a hissing sound in her chest.  During the first part of 1994, she had an asthma attack one or twice a week and her parents took her to the doctor.  (Tr. pp. 10-11.)

In June 1994, she went to the emergency room after an asthma attack in the morning; she remained at the emergency room until the afternoon.  She purchased a respiratory therapy machine and used it 2 or 3 times a week.  According to Dr. de Jesus' summary of Rodriguez's medical record ". . . her asthma was intermittent and increased in severity between 1993 and 1994 associated to a gasoline exposure requiring permanent bronchodilator therapy and the use of systemic cortisone." (See also, Exh. 4G.)  In August 1994 she felt the gasoline odors two to three times a week and had various asthma attacks.

In August 1994 she moved to Santa Rita, Rio Piedras to begin her studies at the University of Puerto Rico.  She visited her parents in Utuado every week (from Thursdays to Sundays.)  (Tr. p. 15-19.)

Her health improved while she was in Rio Piedras. Every time she visited her parents in Utuado, however, she exhibited the symptoms previously described.  In 1995 she reduced her visits to Utuado.

Ms. Rodriguez was also emotionally affected by her asthma attacks.  She felt guilty and frustrated because of the stress and concern her asthma attacks caused her parents.  She also noticed that the relationship within the family was strained because they all because irritable as a result of this situation.

She felt the gasoline odor until 1997, although with less intensity.

The Court finds that Ms. Rodriguez has proven by a preponderance of the evidence that the damages she suffered were caused by the gasoline fumes.  Accordingly, she is entitled to damages in the amount of **$65,000.**

### 11.  **Edgar Reyes-Perez**[25]

At the time of the exposure, Mr. Reyes-Perez lived with his wife at D-3 Cabrera Development.  He has a Bachelors

---

[25]  Transcript of proceedings on July 7, 2007, pp. 54-69. Plaintiffs' Exhs. 3L, 4H and 6.

Degree in Education and Masters Degree in History and has worked as a teacher all his life.

He first felt a strong gasoline odor in November 1993. (Tr. p. 56.) He then began to experience strong headaches, throat irritation and itching, skin rash, watery eyes and nasal secretions. In the year 1994, in a seven day week span, he felt the odor four to five times a week (in the mornings, the afternoons and nights.) (Tr. pp. 57-58.)

1994 was a "terrible year" for Mr. Reyes. He had an upper respiratory tract infection and suffered twice from nasal and bronchial inflamation. (Tr. p. 58 and Exh. 4H.) The headaches caused him pain, discomfort and irritation. (Tr. p. 60.) As a professor, the pain and nasal secretion affected him whenever he was teaching. (Tr. p. 65.)

In 1995, he felt the gasoline odor three to four days a week, in 1996 twice a week but only once a week in 1997. (Tr. pp. 63-65.)

He was never ordered to provide urine or blood samples to determine the presence or absence of gasoline components in his body. (Tr. p. 68.)

Dr. de Jesus testified that the symptoms described by Mr. Reyes, as summarized in Exhibit 4H, were caused by the exposure to the gasoline fumes in Cabrera, and this Court so finds.

Similarly, Dr. Cedeño testified that Mr. Reyes' symptoms were consistent with chronic exposure to an irritant such as gasoline. (Docket No. 101, pp. 129-130.) He also agreed that it was more likely that not that Mr. Reyes' symptoms were caused by his exposure to gasoline fumes. (Id. pp. 118-130, 152-162.)

The Court finds that Mr. Reyes has proven by a preponderance of the evidence that the damages he suffered were caused by the gasoline fumes. Accordingly, he is entitled to damages in the amount of **$35,000.**

### 12. Delia I. Reyes-Jimenez[26]

Delia I. Reyes-Jimenez has lived at B-19 Cabrera Development for 44 years. (Tr. p. 70.) At the time of the exposure, she lived with her husband, two children (Francisco and Marta), her son-in-law and her granddaughter. She first felt the "strong" gasoline odor in November 1993 and remembers feeling nauseous, dizziness, itching and burning sensation in her eyes, and throat and skin irritation. (Tr. pp. 71-72.)

In 1994 she felt a stronger gasoline odor and testified that her symptoms worsened. (Tr. p. 93.) Her eyes, nose and throat were irritated and congested. From the end of 1993 to 1996, Ms. Reyes visited Dr. Brocco to treat her symptoms several times because she felt "breathless." She also visited the

---

[26] Transcript of proceedings on July 7, 2007, pp. 70-88. Plaintiffs' Exhs. 3M, 4L and 6.

emergency room in Utuado, were she received respiratory therapy. As a housewife, Ms. Reyes spent the majority of her time in her house and she was exposed to the fumes and odors every day.

During 1995, Ms. Reyes felt the odors four days a week; the symptoms previously mentioned appeared each one of those days.  She attempted to sell her house for two years "but no one wanted to buy a house in Cabrera Development because everybody was afraid because of the gas in the air . . .".  (Tr. p. 79.)  During 1996 and 1997, Ms. Reyes felt the odors with less intensity. Before the gasoline spill, she never had asthma.

Dr. de Jesus' expert opinion was that Ms. Reyes had respiratory problems before the spill.  After the spill, however, she was diagnosed with asthma and/or chronic obstructive pulmonary disease.  It was Dr. de Jesus' opinion that the effects documented in Ms. Reyes' chart are related to her exposure to the gasoline fumes in Cabrera.  Dr. Cedeño, defendant's expert, agreed that a person with a respiratory condition should not be exposed to airway irritants, such as gasoline.  He further agreed that Ms. Reyes' symptoms and medical condition are consistent with the chronic exposure to an irritant such a gasoline, to which all plaintiffs were exposed.  (Docket No. 110, pp. 129-130.)  Moreover, he stated that it was more likely than not that her conditions and symptoms were caused by the gasoline fumes.  (Id. pp. 118-130, 152-162.)

The Court finds that Ms. Reyes has proven by a preponderance of the evidence that the damages she suffered were caused by the gasoline fumes.  Accordingly, she is entitled to damages in the amount of **$45,000.**

### 13. **Ana V. Maldonado-Rivera**[27]

Ana V. Maldonado-Rivera lived with her husband, Manuel Rivera-Rodriguez, and her four children (Nayeli, Nicole, Alexander and Manuel Alejandro) at B-42 Cabrera Development at the time of the exposure period.  She had been diagnosed with asthma when she was 16 years old.  Ms. Maldonado testified before the Utuado Court.

Ms. Maldonado first felt the gasoline odor on December 3, 1993, the same day she returned home from the hospital after Manuel Alejandro was born.  (Tr. pp. 92-93.)  She felt a "strong" gasoline odor that produced an asthma attack, nausea, headache, dizziness, and eye and skin irritation.

From early 1994, she visited the emergency room (Utuado Diagnostic & Treatment Center and the Caparros Diagnostic and Treatment Center of Utuado) many times because of "asthma exacerbations."  She also visited some physicians in Utuado to treat her symptoms.  Her medical summary shows an increase in the severity and frequency of her asthma attacks because of chronic

---

[27] Transcript of proceedings on July 7, 2007, pp. 89-113. Plaintiffs' Exhs. 3N, 4N and 6.

exposure to the gasoline fumes.[28]  Her symptoms were treated with many drugs like Azmacort, Uniphyl, Medrol, as well as respiratory therapies to control her asthma.  Her daily activities were also limited; as a result, Ms. Maldonado felt desperate.

Dr. de Jesus testified that Ms. Maldonado's asthma exacerbation was caused by the gasoline fumes, and so this Court finds.

One of her primary physicians, Dr. Caparros, advised her to move from Cabrera to avoid exposure to the gasoline fumes.

Her family was also affected by the gasoline fumes. She recalled when she visited the emergency room with two of her children (Alexandra and Manuel Alejandro), because of their asthma. (Tr. pp. 101-106.)  She was emotionally affected by this situation involving her children.

Defendant's medical expert did not exclude gasoline as the cause of Ms. Maldonado's damages and suggested other factors that "could" have also caused the symptoms alleged by Ms. Maldonado.  In reaching his conclusion, however, Cedeño only considered plaintiff's medical records and excluded other environmental factors.

Ms. Maldonado was never ordered to provide any urine or blood samples to determine the presence or absence of gasoline components in her body.  (Tr. p. 117.)

---

[28]  See Exh. 4H.

The Court finds that Ms. Maldonado has proven by a preponderance of the evidence that the damages she suffered were caused by the gasoline fumes.  Accordingly, she is entitled to damages in the amount of **$50,000**.

### 14.  **Miriam Maldonado-Lugo**[29]

Plaintiff Miriam Maldonado-Lugo lived at E-28 Cabrera Development before and during the exposure period with her then husband (Oscar Rodriguez) and their four children (Oscar, Yeritza, Michael and Joshua Rodriguez-Maldonado.)  She has a Bachelors Degree in elementary education, a Masters Degree in Management and Supervision and a Masters Degree in grammar school curriculum development for K-3.  (Tr. pp. 6-7.)

At the end of 1993, she felt strong gasoline odors during the early mornings, evenings and at night.  (Tr. p. 8.)  She felt the odors more strongly after it rained.  She testified that the gasoline odors caused irritation in her eyes (tearing) and nasal secretions.  By 1994, she felt very strong headaches accompanied by dizziness, nausea, vomiting, throat irritations and constant throbbing in her temple area.  Those symptoms increased in 1995.  Id. pp. 8-9.  Before the gasoline spill, she did not have headaches like the ones she experienced throughout the exposure. Before the spill, however, she was sensitive to temperature changes and to very strong perfumes.

---

[29] Docket No. 103, pp. 6-23; Plaintiffs' Exhs. 3O, 4M and 6.

She visited Dr. Dimas Brocco to treat her health condition; Dr. Brocco prescribed Migralam and Tusnel.  He diagnosed her headaches as migraines in August 28, 1995 and referred her to a specialist (neurologist), Dr. Oscar J. Benitez.  Her last visit to Dr. Benitez was in December 1997.  (Id. p. 10.)

She felt desperate because of the odors, her health and the health of her four children.  She purchased a respiratory machine for her children and gave them therapies every four hours.  Because of the fumes, her family suffered through a difficult and desperate situation, which affected her emotionally.

We find that plaintiff's headaches worsened and that she began to suffer from "chemical migraines" due to the gasoline fumes.

The Court finds that Ms. Maldonado has proven by a preponderance of the evidence that the damages she suffered were caused by the gasoline fumes.  Accordingly, she is entitled to damages in the amount of **$35,000.**

### 15.  **Lillian Montalvo-Cuevas**[30]

Plaintiff Lillian Montalvo-Cuevas lived at B-36 Cabrera Development from 1983 to 2002.  She has a Bachelors Degree in Secretarial Sciences and has worked for the University of Puerto Rico, Utuado Campus for the last 25 years.

---

[30] Docket No. 103, pp. 24-38; Plaintiffs' Exhs. 3P, 4k and 6.

Ms. Montalvo first noticed the fumes at the end of 1993.  In December 1993 she awoke at 5:30 a.m. and felt a very strong gasoline odor.  She was not able to identify the cause of the odor.  (Tr. p. 25.)

She began to feel eye irritation (including teary eyes), severe headaches (including dizziness and vomiting and feeling like her head "was about to explode".)  (Tr. p. 26.)  Those headaches were so strong that they hindered her from going to work and doing her household chores.  The medication she was taking caused her to have chest pains for a few minutes, but it relieved the headache and allowed her to sleep.  She had not been diagnosed or treated for migraine headaches prior to 1993.  (Tr. p. 27.)

During calendar year 1994, she felt the odors and the symptoms previously described six or seven days a week.  Those odors were stronger during the early morning hours.  She also felt the odors late at night.  In 1994 she suffered from migraines, eye irritation, swollen eyes, teary eyes, throat ache, nausea and dizziness.  During 1995 she felt the odors and their effects at least five to six days a week.  In 1996 she felt the odors four to five days a week.  Albeit less frequently, she also received medical attention for those symptoms in 1996.  (Tr. 28-29 and 32.)

The headaches continued with the same intensity.  She also suffered from colds, asthma attacks, bronchitis, nausea and vomiting, something she had never experienced before.  In 1996

she felt headaches though to a lesser degree.  In 1997 she felt the
odors two to three times a week, in the early morning hours and
when it rained.  (Tr. pp. 26-30.)

          Ms.  Montalvo  further  testified  that  she  was
emotionally affected by seeing her daughters become ill because of
the odors.  For instance, her oldest daughter, Nilliam (who at that
time was nine years old), had asthma before the spill.  Nilliam's
asthma was aggravated, however, during the spill.  Nilliam also had
frequent eye irritation, skin irritation, headaches and throat
aches during that time.  (Tr. pp. 30-31.)

          Neither Ms. Maldonado nor her family members had
medical tests performed in order to determine the presence or
absence of gasoline components in the body.  (Tr. p. 34.)

          Dr.  de  Jesus  testified  that,  in  her  opinion,
Ms. Montalvo's visits to consultations with doctors were related to
her  exposure  to  the  gas  fumes.   She  further  explained  that
Ms. Montalvo's migraines worsened because of her exposure to the
fumes.

          Similarly, Dr. Cedeño testified that Ms. Montalvo's
symptoms are consistent with the chronic exposure to an irritant
such as gasoline to which all plaintiffs were exposed.  (Docket
No. 101, pp. 129-130.)  That the exposure "may" have affected them
and that it was more likely than not that the symptoms alleged by

the plaintiffs were caused by the gasoline odors.  (Id. pp. 118-130 and 152-162.)

The Court finds that Ms. Montalvo has proven by a preponderance of the evidence that the damages she suffered were caused by the gasoline fumes.  Accordingly, she is entitled to damages in the amount of **$40,000.**

### 16.   **Myrta E. Jordan-Perez**[31]

Plaintiff Myrta Jordan-Perez currently lives at D-36 Cabrera Development and lived there with her husband, two of her daughters and her grandson during the exposure period.  She works as a Program Supervisor for the San Lucas Hospice of Utuado.  (Tr. p. 43.)

Late in 1993, she felt extremely strong gasoline odors in her neighborhood at all times.  (Tr. p. 45.)  The odors would wake her up and caused her throat to hurt and her eyes, nose and respiratory ways to become irritated.  (Tr. pp. 46 and 55.) The situation caused her anxiety, irritation and restlessness.  She expressed that she did not know what to do, felt defenseless, very sad and anxious.  (Tr. pp. 46 and 54.)  She bought over-the-counter drugs to alleviate her symptoms.

Her grandson (Francisco) would also wake-up at night weeping and crying because of the strong odors.  (Tr. p. 48.)  The family stopped using the "outside area" of her house, such as the

---

[31]  Docket No. 103, pp. 43-54; Plaintiffs' Exh. Nos. 3Q and 6.

balcony, and had to close the doors and windows and remain inside. The gasoline odors were stronger in 1994 and 1995, but lessened in intensity in 1996.  Id.

The Court finds that Ms. Jordan has proven by a preponderance of the evidence that the damages she suffered were caused by the gasoline fumes.  Accordingly, she is entitled to damages in the amount of **$30,000.**

## IV.  CONCLUSION

Accordingly, the Court awards damages as follows:

1.    Aristides Rodriguez-Rivera:  $65,000

2.    Eneris Gutierrez-Torres:  $100,000

3.    Alicia Villafañe-Orgay:  $85,000

4.    Jose O. Ralat-Aviles:  $45,000

5.    Shara Lee Vera-Negron:  $150,000 ($100,000 for her own damages and $50,000 for the damages claimed on behalf of her minor son Agustin Ruiz-Vera)

6.    Elsie C. Alvarez-Serrano:  $75,000

7.    Carlos J. Rodriguez-Rodriguez:  $45,000

8.    Jose Guzman-Matias:  $40,000

9.    William Acevedo-Labrador:  $35,000

10.   Rebeca Rodriguez-Ariño:  $65,000

11.   Edgard Reyes-Perez:  $35,000

12.   Delia I. Reyes-Jimenez:  $45,000

13.   Ana Veronica Maldonado-Rivera:  $50,000

Civil No. 04-1964 (FAB)                                                    62

    14.  Miriam Maldonado:  $35,000

    15.  Lillian Montalvo:  $40,000

    16.  Mirta E. Jordan:  $30,000

For a total of **$940,000.00.**

    The case is referred to Magistrate Judge Marcos E. Lopez to
hold however many settlement conferences as are needed before
**August 1, 2008** as to the remaining plaintiffs.

    **IT IS SO ORDERED.**

    San Juan, Puerto Rico, June 20, 2008.


                              s/ Francisco A. Besosa
                              FRANCISCO A. BESOSA
                              United States District Judge